*204
ORDER DENYING MOTION TO AMEND DISCOVERY ORDER

(Opinion)

Katharine English, Chief Judge.
A. ISSUE PRESENTED
In this personal injury case that arises out of a collision between Plaintiff and a casino employee on the casino gaming floor, this Court previously ordered that Plaintiffs attorneys can inspect the surveillance room at Spirit Mountain Casino. Defendant, Spirit Mountain Gaming, Inc., dba Spirit Mountain Casino, has filed a motion to amend the Court’s prior discovery order so as to preclude Plaintiffs attorneys from inspecting the surveillance room at the casino. Defendant argues that inspecting the surveillance room will not produce or lead to the discovery of any information or evidence relevant to any claim or defense in the action, that Defendant’s concern with safeguarding casino security far outweighs any need Plaintiff may have for the inspection, and that any order allowing the inspection is premature because Plaintiff may obtain the information she needs from other sources, such as by deposing casino security staff or other prospective witnesses. Alternatively, Defendant suggests that, if any inspection is to take place, the Court initially make its own inspection in order to determine whether any relevant information would be gleaned from Plaintiffs inspection of the surveillance room.
Plaintiff disputes each one of Defendant’s assertions, contending that her attorneys need to view the surveillance room, and that depositions or other discovery techniques cannot serve as adequate substitutes for such an inspection, that the Court already has imposed more than sufficient safeguards strictly limiting Plaintiffs use or disclosure of what her attorneys learn from their inspection of the room, and therefore that the Court already has responded to Defendant’s concerns regarding any possible compromise of casino security.
For the reasons that follow, the Court adheres to its earlier order. As explained below, in crafting its earlier order the Court balanced plaintiffs need for the inspection against Defendant’s legitimate concern with maintaining and protecting casino security. The Court’s order pro *205 tects both parties’ interests by allowing the inspection, to be made by Plaintiffs attorneys only, and by placing stringent limits on their use of anything they learn from the inspection.
B. BACKGROUND
This case arises out of a collision between Plaintiff and a casino employee on the floor of the casino on February 13, 2001. Plaintiff has filed suit against the casino alleging that the employee was negligent in walking too fast, failing to keep a proper lookout, failing to maintain control of himself, and in carrying a container that partially blocked his vision. In discovery, Plaintiff sought any photographs or videotapes that Defendant had taken of her and of the accident. In response, Defendant produced a copy of all the known footage it had of Plaintiff. Plaintiff describes the one videotape given to her by Defendant as being “of poor viewing quality showing one view of the collision which took place.”
Defendant has explained that it does not and cannot have any additional footage or videotapes of the accident. When an accident occurs on the casino gaming floor, a dub is made from the master tape and is retained, but the master tape is later reused.[1] Plaintiff already has been given the only dubbed tape that shows the accident. Pursuant to customary casino policy, all other tapes have been recycled and reused.
At a pretrial conference held on March 14, 2003, the Court first ordered that Plaintiffs attorneys could view the surveillance room at the casino. Subsequently, Defendant’s attorney sought reconsideration of that order. In its March 28, 2003, order, the Court adhered to its earlier decision and ordered again that Plaintiffs attorneys could view the surveillance room. The Court reasoned that Plaintiff had a strong interest in seeking to gather evidence and in demonstrating that relevant evidence might have been destroyed by Defendant.
Nevertheless recognizing that Defendant has a legitimate and significant concern with casino security, the Court imposed stringent limitations on Plaintiffs use of the information gleaned from its inspection. Those safeguards include: (1) the fact that only Plaintiffs attorneys, and not Plaintiff herself, can view the surveillance room, (2) that the attorneys cannot divulge to their client what they learned, (3) that any questions regarding the location and operation of the surveillance room and the equipment in it must be asked in a deposition only and without Plaintiff being present, unless Defendant’s counsel agrees that the questions may be asked in some other forum, (4) that any tape or transcript of any such deposition is to be sealed by the Court and not revealed to Plaintiff, (5) that any testimony regarding the matter first be heard in chambers and remain under seal, unless the Court determines that the evidence is admissible, and (6) that Plaintiffs attorneys may not discuss with Plaintiff or anyone else what they learn in their inspection, except as absolutely necessary to prepare Plaintiffs case. In their response to Defendant’s motion to amend the Court’s earlier discovery order, Plaintiff’s attorneys aver that, as officers of the Court, they agree at all times to abide by the “severe limitations” that the Court has imposed on the inspection that it has allowed.
As noted, Defendant now has moved to amend the Court’s March 28, 2003, discov *206 ery order so as not to allow Plaintiffs attorneys, or anyone else acting on Plaintiffs behalf for that matter, to: view the casino surveillance room. Plaintiff opposes that motion.
C. DISCUSSION
Defendant’s motion to amend the Court’s earlier discovery order is based on Fed.R.Civ.P. 60(b), which provides in part that “[o]n motion and upon such terms as are just, the Court may relieve a party or a party’s legal representative from a final, judgment, order, or proceeding” for certain reasons that are listed in the rule. (Emphasis added).[2] As Plaintiff notes, and as the word “final” indicates, the rule applies only to final decisions and not to interlocutory orders. Prudential Real Estate Affiliates v. PPR Realty, 204 F.3d 867, 880 (9th Circ.2000); Charles A. Wright, Arthur R. Miller and Mary Kay Kane, 11 Federal Practice and Procedure, § 2852 at 233-34 & n 8 (2d ed 1995).
That rule 60(b) does not apply here does not mean that the Court lacks authority: to reconsider or to amend its earlier discovery order, however. Instead, the fact that “ ‘interlocutory judgments [or orders] are not brought within the restrictions of the rule’” means that “‘they are left subject to the complete power of the court rendering them to afford such relief as justice requires.”’ Charles A. Wright, Arthur R. Miller and Mary Kay Kane, 11 Federal Practice and Procedure, § 2852 at 233-34 n 8, quoting Advisory Committee Note to Rule 60(b). See also John Simmons Co. v. Grier Brothers Co., 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922) (“at any time before final decree,” a court may modify or rescind an interlocutory order). Thus, the Court has broad authority, constrained only by the proper exercise of its own discretion, to amend, rescind, or modify its prior discovery orders. The question then becomes whether the Court should exercise that discretionary authority in this case and grant Defendant’s motion. Having given due consideration to the arguments presented by both parties to this litigation, the Court adheres to its earlier order.
Fed.R.Civ.P. 26(b)(1) provides that, unless the Court otherwise limits the scope of discovery, “[pjarties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things * * *.” In addition, “[fjor good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.” Id.
Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).
Id.[3]
In asking the Court to amend its earlier discovery order, Defendant empha *207 sizes the amendment to Rule 26(b)(1), made in 1978, that changed the phrase “relevant to the subject matter involved in the pending action” to the current phrase, “relevant to the claim or defense of any party.” See Charles A. Wright, Arthur R. Miller and Richard L. Marcus, 8 Federal Practice and Procedure § 2008, 2008 pocket part at 18-19 (regarding that 1978 amendment). Relying on an unpublished federal district court decision, Johnson v. Mundy Industrial Contractors Inc., 2002 WL 31464984 (E.D.N.C.2002), Defendant suggests that change in the wording of Rule 26(b)(1) served to narrow the scope of discovery. Defendant, however, overestimates the effect and significance of the 1978 amendment to the rule.
First, as Defendant appears to recognize, “[pjerhaps the single most important word in Rule 26(b)(1) is ‘relevant.’ ” 8 Federal Practice and Procedure § 2008 at 99. That significant term remains unchanged in Rule 26(b)(1). And second, the effect of the 1978 amendment to the rule is not to eliminate a party’s ability to obtain discovery of material that is relevant to the “subject matter” of the action, but instead to involve the Court in the discovery process. “Discovery that is not relevant to any claim or defense in the action but does relate to the subject matter of the case can [still] be had, but only on Court order based on a showing of good cause.” 8 Federal Practice and Procedure § 2008, 2003 pocket part at 18-19. That is, “[t]he amendment d[id] not effect a dramatic change in the scope of discovery. In part, it [wa]s designed to involve judges in cases that present problems with the scope of discovery.” Id. at 19. Moreover, “[t]he good cause standard that informs th[e] [court’s] decision ‘is meant to be flexible[.]’” Id., quoting Jenkins v. Campbell, 200 F.R.D. 498 (M.D.Ga.2001).
Thus, even assuming that the discovery sought by Plaintiff and previously ordered by the Court is relevant to the “subject matter” of the case, but not to any party’s claim or defense, Plaintiff still may obtain that discovery. The only limitations are that the Court must order the discovery— as it already has in this case—and that Plaintiff must make a showing of good cause under the flexible standard provided by Rule 26(b)(1).
Defendant contends, in effect, that Plaintiff has not made an adequate showing of good cause. In Defendant’s view, Plaintiff does not need to view the surveillance room because she already has been given the only pertinent videotape that exists and because all other videotapes that might have shown anything else relevant to the case have long since been recycled and reused. Plaintiff responds that she needs to have her attorneys view the surveillance room because she
believes that there may be other contiguous videotapes which were filmed from the surveillance room which would more clearly and extensively show the development of the incident and the incident itself. It is Plaintiffs contention that only an inspection of the surveillance room will assist Plaintiffs [attorneys] in evaluating the extent to which Defendant has disposed of evidence.
As one can see, Defendant’s and Plaintiffs arguments on this point appear to pass each other like the proverbial ships in *208 the foggy night. Defendant seems to assume that the inspection of the surveillance room could be warranted only if it could or would lead to the discovery of another videotape or some other recording of the event. Based on that assumption and that understanding, Defendant sees no need for the inspection because there are not now and cannot be any other videotapes still in existence. That is not what Plaintiff seeks, however. Instead, Plaintiff seeks to show that at some time there likely were other tapes, made by other nearby video-recorders, that would have or could have shown the incident, but that were subsequently destroyed, either inadvertently or deliberately, by Defendant. In Plaintiffs view, the issue is not whether there now are any additional videotapes, but instead is whether “Defendant has disposed of evidence.”
That issue is one that is or may be relevant in this case, at least for impeachment purposes and to contest what may be Defendant’s eventual reliance on the one videotape that does exist.[4] As noted, under Rule 26(b)(1), to be discoverable evidence need only be “relevant to the claim or defense of any party[.]” Here, the location of other video-recorders in the surveillance room, and the possibility that those recorders also might have taped the incident and that those tapes later were reused, is information that appears to be relevant both to Plaintiffs claims of negligence and to Defendant’s denial of those allegations. To reiterate, Plaintiffs theory is that Defendant’s reuse of the videotapes may suggest that “defendant has disposed of evidence.” A party’s destruction of relevant evidence may suggest a motive to do away with the evidence and prevent it from falling into the hands of the opposing party. And that, in turn, may suggest the party’s awareness of its employee’s fault in the matter, and of its own potential liability. Plaintiff avers that, as early as the day of the accident, Defendant’s security staff was aware of the incident and suspected that a lawsuit might result.
Furthermore, even if the information gleaned from an inspection of the surveiF lance room led to the discovery of material that could be used only for impeachment of Defendant’s witnesses, that would be enough under the rule to permit Plaintiffs inspection. 8 Federal Practice and Procedure § 2008, 2003 pocket part at 19, quoting Advisory Committee Note (“ ‘information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable’ ” under Rule 26(b)).[5] In sum, Plaintiff has shown a need for the *209 inspection that is sufficient to warrant such pretrial discovery.
Defendant cites and relies on two cases (one an unreported federal district court decision) that, Defendant contends, stand for the proposition that “the liberal relevancy standard applied to the production of documents has been rejected in the context of discovery involving entry upon a party’s premises.” It is doubtful whether any such wide-sweeping, categorical rule could ever make sense or be applied in a discovery context where the Court must consider and balance a number of factors and competing interests. Discovery disputes are by their very nature fact-bound and at least somewhat case-specific.
In any event, the two decisions cited by Defendant do not stand for the broad proposition Defendant attempts to distill from them. In both Belcher v. Bassett Furniture Industries, Inc., 588 F.2d 904, 907 (4th Cir.I978), and Johnson v. Mundy Industrial Contractors, Inc., 2002 WL 31464984 (E.D.N.C.2002), the Plaintiffs explanation as to why it needed the disputed discovery amounted to little more than what the Johnson court described as the assertion that “it could help.” 2002 WL 31464984, *3. That is, in those cases the Plaintiffs “language [wa]s tantamount to ‘boilerplate’ ” only. Id., 2002 WL 31464984, *3. As discussed above, plaintiff has made a considerably more compelling case here and has explained why her attorneys need to see the surveillance room. Plaintiff has not relied on mere boilerplate or on vague assertions that have nothing to do with the specifics of this case.
Defendant also suggests that it should not have to allow Plaintiffs attorneys into the surveillance room because the gaming compact between the Tribe and the state, and 25 C.F.R. § 542.43(c), prevent it from doing so.[6] The compact provides that the state “acknowledges that the Tribe has voluntarily given the State access to * * * information” regarding “sensitive financial, security and surveillance information that the Tribe considers confidential” and that “the Tribe otherwise would not be required by law” to disclose. Grand Ronde/State Class III Gaming Compact, section 9(2)(f). In the compact, the state also “acknowledges that this information should reasonably be considered confidential.” Id. However, the compact also provides unambiguously that nothing in section 9 “precludes the State or the Tribe from disclosing information pursuant to state, tribal or federal rules of civil procedure or evidence to connection with litigation, a prosecution or a criminal investigation.” Id., section 9(3). See also id., section 13(E). (“This Compact is for the benefit of and governs only the respective authorities of and the relations between the Tribe and the State”). Thus, the compact does not support nondisclosure here. Instead, it simply does not apply.
The provision of the code of federal regulations on which defendant relies, 25 C.F.R. § 542.43(c), provides that:
Access to the surveillance room shall be limited to surveillance personnel, designated employees, and other persons authorized in accordance with the surveillance department policy. Such policy shall be approved by the Tribal gaming regulatory authority. The surveillance department shall maintain a sign-in log of other authorized persons entering the surveillance room,
*210 Rather dearly the “policy” contemplated by this rule is one intended to cover the usual, day-to-day access to the surveillance room at a Tribal gaming site. The policy does not purport to cover all situations and it does not suggest that a court with jurisdiction over a civil suit can not properly order access by persons other than those contemplated by the day-to-day policy. Indeed, it would be extraordinary if a mere administrative regulation could serve to deprive a court of competent jurisdiction of its authority and control over discovery matters in cases before it and of its ability to effect and enforce its own discovery orders. Nothing in the text of this administrative rule supports such an unlikely and extraordinary reading of it.
Defendant also emphasizes its legitimate and significant security concerns and its need to guard against undue disclosure of the location of its surveillance room and of the areas of the casino floor covered by the video-cameras in that room. In permitting Plaintiffs attorneys to view the surveillance room, the Court in no way doubts the validity of or diminishes the importance of those concerns. The Court has placed those weighty concerns in the balance, and it is those concerns that have prompted the Court to impose what Plaintiff accurately describes as “severe limitations on th[e] examinational” See generally 8 Federal Practice and Procedure § 2036, at 488 (“the rules * * * permit the broadest scope of discovery and leave it to the enlightened discretion of the district court to decide what restrictions may be necessary in a particular case”) (footnote omitted); Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir.2002) (“Before restricting discovery, [a] court should consider the totality of the circumstances, weighing the value of the material sought against the burden of producing it, and taking into account society’s interest in furthering the truth-seeking function in the particular case before it”) (internal quotation marks and citations omitted); Brown Bag Software v. Symantec Corp., 960 F.2d 1465 (9th Cir.), cert. denied 506 U.S. 869, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992) (in cases involving discovery of trade secrets, the parties’ “conflicting interests suggest a balancing test will best resolve protective order disputes;” the court should balance the risk of disclosure of trade secrets against the risk that non disclosure will impair pretrial preparation of or trial of a claim).[7]
The limitations imposed by the Court in this case are outlined above. In essence, those limitations mean that, although Plaintiffs attorneys can view the surveillance room, they cannot disclose what they have learned to anyone, or make any use of the information at trial without the Court’s permission. Even deposition inquiries relating to the location and operation of the surveillance room and the surveillance equipment in it are to be conducted without Plaintiff being present, and the record then is to be sealed. These stringent limitations on Plaintiffs attorneys’ use of what they see and what they learn during their inspection are designed to and should protect the security and integrity of casino security. Plaintiffs attorneys can look, but they can’t tell.
Defendant expresses some skepticism about allowing “an attorney adverse to the interests of the casino” to be given access “on behalf of his client.” But Plaintiffs *211 attorneys have affirmed that, as officers of the Court, they will abide by the limitations imposed by the Court. The Court has no reason to doubt those assurances.
Thus, the rather extreme limits that the Court has imposed on Plaintiffs attorneys’ use of what they see and learn in the surveillance room—and the continuing checks on their use of that information which require them ultimately to obtain the Court’s permission before that information can be introduced at trial or other-vase made public in any way—were crafted to allow Plaintiff to develop her case while ensuring that casino security is in no way compromised. The Court understands that the casino’s strong preference is to allow no access at all to Plaintiff or her legal representatives. But that solution, while understandably attractive to Defendant, would leave Plaintiff with no way to attempt to establish that Defendant destroyed tapes that might well have shown the accident. Defendant’s security concerns are indubitably weighty, but they are not so weighty as to knock Plaintiffs need for the inspection completely off the balance scale.
Defendant suggests that Plaintiffs request to inspect the surveillance room is premature because she can learn from deposition testimony whether other surveillance footage exists. But again defendant misunderstands the theory that underlies Plaintiffs request. Plaintiff appears to accept that there is no additional, extant videotape. Indeed, that is part of her point. Her claim is that “defendants should not have recycled the master tape(s) of this incident,” that “other contiguous videotapes which were filmed from the surveillance room” might have shown “more clearly and extensively” than the one remaining dubbed tape “the development of the incident and the incident itself,” and that “only an inspection of the surveillance room will assist Plaintiff in evaluating the extent to which Defendant has disposed of evidence.” Asking questions at a deposition about the current existence of other videotapes would not advance or even relate to that theory.
Defendant also has suggested, as an alternative to allowing Plaintiffs attorneys to have access to the surveillance room, that the Court make its own inspection. That course, however, would put the Court in the untenable position of becoming a prospective witness or of possessing information that ultimately may not come out at but could be relevant at trial. Defendant’s proposed solution also would not allow Plaintiffs attorneys to develop their own-theory of this case. The Court cannot be expected to, and has no desire to, step into the shoes of Plaintiffs attorneys or to assume their role.
In sum, having carefully considered and weighed the matter and after giving due regal'd to the arguments of both parties, the Court remains convinced that Plaintiff has a legitimate need to inspect the surveillance room, and that such an inspection involves a matter that is relevant to the claims and defenses of the parties. Moreover, even if, alternatively, the inspection involves a matter relevant to the subject matter of the action only, Plaintiff has shown good cause justifying the Court’s discovery order. Because admittedly, on the other hand, Defendant’s security concerns are both legitimate and significant, the Court has imposed extremely stringent limitations on Plaintiffs attorneys’ use of what they see and learn. The Court has weighed the parties’ interests and has struck a balance that serves the interests of both parties by giving Plaintiff the discovery to which she is entitled, while keeping Defendant’s security secrets just that—secret.
*212 D. CONCLUSION
For the reasons given above, the Court declines to amend its March 28, 2003, discovery order and reaffirms that order.

. In contrast, when criminal activity occurs, and is shown on tape, a dub is made and the master tape also is retained.

. This Court has adopted as its rules ol procedure the Federal Rules of Civil Procedure.

. The Court may limit the frequency or the extent of use of the discovery methods otherwise permitted by the rules if the court determines that “(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable (rom some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the *207 proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2)(i)-(iii). This rule provides the legal source for Defendant’s arguments that Plaintiff's attorneys should not be permitted to view the casino surveillance room because Plaintiff has other means to obtain the information she needs, because she already has been given the only pertinent videotape that exists, and because the inspection may compromise casino security and thus is burdensome and harmful to Defendant.

. The Court has not seen that videotape. But one may reasonably assume that if it strongly supported Plaintiff's case, Plaintiff would not be so concerned with the possible destruction of other videotapes. In any event, plaintiff contends that the tape she has is of poor quality and Defendant has not disputed that description.

. One can readily imagine that at trial Defendant might call its security manager or someone else familiar with the surveillance and taping systems to authenticate the one tape that exists, to explain the customary practice of reusing videotapes, and to testify that, if any other tape had shown the collision involving Plaintiff, it would have been copied and the copy would have been retained. On cross-examination, Plaintiff might well want to challenge or impeach such a witness's testimony by inquiring about the location of other video-recorders and the possibility that one of them might also have recorded the incident. Plaintiff’s attorneys’ inspection of the surveillance room could provide the information that could lead to such relevant questioning.
By making this observation, the Court does not mean to suggest that it would permit such questioning if a trial were held. The point is not to forecast any future pretrial or trial rulings, but to give an example of how the information Plaintiff seeks might prove relevant later.

. Defendant does not appear to argue that either provision creates any privilege, at least as that term is used in Rule 26(b)(1).

. Even the formula for coca-cola—one of this country’s most closely and jealously guarded trade secrets—has been subject to discovery, under limitations and controls designed to protect the security of that trade secret. Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288 (D.C.Del. 1985) (allowing the limited disclosure of the formula for coke).